SOUTHEASTERN JURISDICTIONAL ADMIN. COUNCIL, INC. v. EMERSON

[363 N.C. 590 (2009)]

SOUTHEASTERN JURISDICTIONAL ADMINISTRATIVE COUNCIL, INCORPO-
RATED v. GORDON W. EMERSON, DIANE R. EMERSON, PAUL D. HUFFMAN,
DONALD N. PATTEN, AND VIRGINIA B. PATTEN

No. 62A08

(Filed 9 October 2009)

**1. Deeds— restrictive covenants—amendments—service charges—reasonableness**

Restrictive covenant amendments that instituted service charges were reasonable where the community (the Lake Juna-luska Assembly Development) has existed for nearly a century, the community has consistently imposed a wide variety of detailed restrictions to purposefully develop its unique, religious character, and the Council acted in a manner the defendants could reasonably have anticipated. Also, all of the defendants purchased property with awareness of the extensive amenities and thus the many sources of potential common expenses.

**2. Deeds— restrictive covenants—amendments—service charges—enforceability**

Amendments to restrictive covenants to impose service charges were enforceable as written where residents of the community received a list of policies and procedures that explained how property values were determined for the purpose of assessing service charges, and regulations contained an itemized description of the purposes for the assessments, which were limited to common expenses. Limiting provisions for certain properties in the community established that the declaration did not bind property owners outside that section of the development, but did not limit the portion of the development (the Assembly) that could reap the benefits of the covenants.

Justice EDMUNDS concurring.

Justice HUDSON dissenting.

Justice TIMMONS-GOODSON joins in this dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 188 N.C. App. 93, 655 S.E.2d 719 (2008), affirming in part and reversing in part a judgment entered

on 6 June 2006 by Judge W. Erwin Spainhour in Superior Court, Haywood County. Heard in the Supreme Court on 9 September 2008.

> *Adams Hendon Carson Crow & Saenger, P.A., by George Ward Hendon and Matthew S. Roberson, for plaintiff-appellant.*

> *Brown, Ward and Haynes, PA, by Frank G. Queen, for defendant-appellees Emerson and Huffman; and Brown & Patten, PA, by Donald N. Patten, pro se, and for Virginia B. Patten, defendant-appellees.*

NEWBY, Justice.

This case presents the issue of whether community regulations that levy annual service charges on properties in the Lake Junaluska Assembly Development ("the Assembly") impose valid affirmative obligations upon the property owners to pay the fees. In light of the unique character of the Assembly and its long-standing history of covenant-imposed regulations, we uphold the covenants as enforceable and reverse the Court of Appeals.

Plaintiff Southeastern Jurisdictional Administrative Council, Inc. ("the Council") is a nonprofit, non-stock corporation that manages, owns, develops, and sells land in Haywood County known as the Lake Junaluska Assembly Development. In addition, the Council maintains and operates the Assembly by providing such services as street lighting, fire and police protection, and maintenance of roads and common areas. The Council is the successor in interest to the Lake Junaluska Assembly; the Lake Junaluska Methodist Assembly; and ultimately the Southern Assembly of the Methodist Church, which was the Assembly's earliest incarnation. The Council operates the Assembly under the auspices of the Southeastern Jurisdictional Conference of the United Methodist Church in the United States of America.

A brief recitation of the Assembly's history is helpful to an understanding of the issues in this case.[1] The idea for the Assembly first took shape in 1908 during the Laymen's Missionary Conference in Chattanooga, Tennessee, when a resolution was passed calling for the establishment of a Methodist assembly in this region. The

---

1. In order to give full consideration to "the nature and character of the community" at issue here, *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 548, 633 S.E.2d 78, 81 (2006), we elect, *ex mero motu*, to take judicial notice of certain facts pertaining to the Assembly that do not appear in the record on appeal. *See* N.C.G.S. § 8C-1, Rule 201 (2007).

**SOUTHEASTERN JURISDICTIONAL ADMIN. COUNCIL, INC. v. EMERSON**

[363 N.C. 590 (2009)]

Southern Assembly was incorporated on 30 June 1910, and soon thereafter, the commissioners chose a location for the assembly and purchased 1200 acres of land for meeting grounds and private residences. By spring of 1913 construction had commenced, and the Southern Assembly began selling lots for private residential use. The Assembly officially welcomed its first visitors on 25 June 1913, when the Second General Missionary Conference of the Methodist Episcopal Church, South was held on the property. In 1929 the Southern Assembly adopted the name of the adjacent lake and officially became the Lake Junaluska Methodist Assembly. In 1948 ownership was transferred to the Southeastern Jurisdiction of the Church.

In addition to being a private residential community and a center for religious conferences and retreats, the Assembly is also the administrative headquarters of the Southeastern Jurisdictional Administrative Council, formed in 1988 when the Lake Junaluska Assembly merged with the Jurisdictional Council of the Southeastern Jurisdictional Conference of the Methodist Church. Today, the Assembly comprises the two hundred acre lake and its adjacent amenities, including meeting facilities and event auditoriums, a campground for recreational vehicles, and rental accommodations such as hotels, apartments, and cottages; as well as more than seven hundred private homes. In its declaration of the protective covenants applicable to certain real property in the Assembly, the Council states that it "is dedicated to the training, edification and inspiration of people who are interested in and concerned with Christian principles and concepts." In furtherance of those purposes, the Assembly offers a variety of family oriented activities for its visitors and year-round residents, such as boat rentals, an aquatic center and outdoor pool, tennis courts, an eighteen hole golf course and a miniature golf course, heritage museums, and historic structures and gardens. Through its many annual events, the Assembly has established itself as a center for religious worship and education, and each year more than 150,000 people visit Lake Junaluska for ministry retreats and other events.

Since the first owners purchased lots in the Assembly nearly one hundred years ago, the development's residential properties have always been subject to restrictive covenants aimed at preserving the unique religious character and heritage of the Assembly. Dating back to 1913, the covenants describe the Assembly's aims as "health, rest, recreation, Christian work and fellowship, missionary and school work, and other operations auxiliary and incidental thereto."

**SOUTHEASTERN JURISDICTIONAL ADMIN. COUNCIL, INC. v. EMERSON**

[363 N.C. 590 (2009)]

Numerous covenants have been incorporated in all deeds to residential properties in the Assembly and are now included in the recorded declaration for the Assembly's more recently developed Hickory Hill subdivision.[2] A provision included in the original covenants gives the Council authority to fine or penalize property owners for violation of the conditions and restrictions set forth in those covenants. The covenants pertinent to this case state:

> Second: That said lands shall be held, owned, and occupied subject to the provisions of the charter of the Lake Junaluska Assembly, Inc., and all amendments thereto, heretofore, or hereafter enacted, *and to the by-laws and regulations, ordinances and community rules which have been, or hereafter may be, from time to time, adopted by said Lake Junaluska Assembly, Inc., and its successors.*
>
> . . . .
>
> Fifth: That it is expressly stipulated and covenanted between [Grantor] and [Grantee and its] heirs and assigns, that *the by-laws, regulations, community rules and ordinances heretofore or hereafter adopted by the said Lake Junaluska Assembly, Inc., shall be binding upon all owners and occupants of said lands* as fully and to the same extent as if the same were fully set forth in this Deed, and that all owners and occupants of said lands and premises shall be bound thereby. (Emphasis added.)

In November 1996 the Council adopted the current Rules and Regulations of the Lake Junaluska Assembly ("the Regulations") pursuant to the authority granted by the foregoing deed covenants. The Regulations require, *inter alia*, that property owners comply with rules that govern landscaping and property appearance, types of structures, livestock and animals, mobile homes and recreational vehicles, gasoline powered boats, alcoholic beverages, inappropriate clothing, and the manner and locations in which roller blades, roller skates, skateboards, and bicycles may be used. The Regulations also implement several fees, including an annual service charge, a grounds fee, and a road impact fee. The subject of this litigation is the annual service charge provision, which states: "Each owner shall pay annually a SERVICE CHARGE in an amount fixed by the SEJ Administrative Council for police protection, street maintenance,

---

2. The parties have variously referred to the subdivision as "Hickory Hill" and "Hickory Hills." Consistent with the subdivision plat and the recorded declaration, we refer to the subdivision as "Hickory Hill."

street lighting, drainage maintenance, administrative costs and up-keep of the common areas." Owners of property in the Hickory Hill subdivision are obligated to pay the annual service charge through similar protective covenants that are incorporated in the Hickory Hill deeds.

Defendants are landowners in the Assembly who refuse to pay the annual service charges assessed to their properties. Defendant Huffman purchased property in 1970 and 1974, and defendants Emerson purchased property in 1992. The deeds to the Huffman and Emerson properties are virtually identical and contain the original covenants that require compliance with the Regulations. Defendants Patten purchased a lot in Hickory Hill in 1996 and are required to pay the service charges pursuant to the protective covenants contained in the subdivision's recorded declaration.

The Council filed suit against defendant property owners to recover the unpaid assessments with interest. In response, defendants variously contended that their deeds did not provide for the assessment of any fee or charge, did not contain a description of the permissible uses of the assessments, and did not describe the property and facilities to be maintained with the money collected. Further, defendants argued plaintiff is not a homeowners' association and thus that defendants' interests were not adequately represented through elections of directors or officers. Finally, defendants argued the expenditures by plaintiff were primarily for upkeep of its own property and development activities. Plaintiff moved for summary judgment as to all defendants, and in response, defendants Patten made a cross-motion for summary judgment. The trial court granted plaintiff's motion for summary judgment, and in so ruling, considered the following "non-controverted" facts:

2. All lots sold by Plaintiff within the Development, other than those within the Hickory Hills subdivision, were conveyed by deeds containing restrictions providing that the properties shall be held, owned and occupied subject to by-laws, regulations, ordinances and community rules adopted from time to time by Plaintiff and its successors, the same to run with the land. Among the rules and regulations adopted by Plaintiff on November 22, 1996 is a requirement that each owner pay an annual service charge for police protection, fire protection, street maintenance, street lighting, drainage maintenance, administrative costs and upkeep of the common areas. Deeds to lots sold within the Hickory Hill area incorporate protective covenants

directly obligating owners to pay an annual service charge for garbage and trash collection, police protection, fire protection, street maintenance, street lighting and upkeep of common areas.

3. Plaintiff has adopted Service Charges, also referred to as Annual General Assessments, for owners of property within the Development, including Hickory Hills, on an annual basis as a millege [sic] rate applied to the real property values of the respective properties as assessed by the Tax Office of Haywood County.

4. Plaintiff, either with its own forces or by means of contractual arrangements with other providers, has provided services and incurred expenses for police protection, fire protection, street maintenance, street lighting, drainage maintenance, administrative costs and upkeep of the common areas in the Lake Junaluska Assembly Development, including Hickory Hills, and Defendant owners of real property have received the benefits of such services and expenses.

Based on these facts, the trial court concluded "that the restrictions, rules and regulations applicable to Defendants' properties provide adequate standards by which to measure the Defendants' liability and that the property to be served and the services to be provided are described with particularity and are sufficiently definite." The trial court then ordered defendants to pay the service charges with accrued interest and dismissed defendants' counterclaims.

A divided panel of the Court of Appeals reversed, holding the Council lacked authority to levy assessments against defendants Huffman and Emerson and that the service charges were unenforceable against defendants Patten. *Se. Jurisdictional Admin. Council, Inc. v. Emerson*, 188 N.C. App. 93, 97-98, 655 S.E.2d 719, 721-22 (2008). The dissent would have affirmed the trial court, noting that "[t]he 1996 Regulations correspond in a legal sense most closely to an amendment to the covenants in the deeds" and that such amendments are evaluated for reasonableness. *Id.* at 100, 655 S.E.2d at 723 (Hunter, Robert C., J., dissenting) (citing *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 548, 633 S.E.2d 78, 81 (2006)).

[1] In *Long v. Branham*, this Court stated that, although real property covenants are typically construed in favor of free use of land, such construction "must be reasonable" and this canon "should not be applied in such a way as to defeat the plain and obvious purposes of a restriction." 271 N.C. 264, 268, 156 S.E.2d 235, 239 (1967)

(citation and internal quotation marks omitted). "In construing restrictive covenants, the fundamental rule is that the intention of the parties governs, and that their intention must be gathered from study and consideration of *all* the covenants contained in the instrument or instruments creating the restrictions." *Id.* at 268, 156 S.E.2d at 238 (citing *Callaham v. Arenson,* 239 N.C. 619, 625, 80 S.E.2d 619, 623-24 (1954)).

Dating back to the Assembly's inception, the relevant documents demonstrate that the covenanting parties' original intent was for the governing body to retain significant control over the planning, development, and operation of the Assembly. The Assembly's charter states that the community was established for the benefit of the United Methodist Church as "a resort for religious, charitable, educational and benevolent purposes." Under that charter, the Assembly is empowered to make rules and regulations through the duly elected Council, which "is dedicated to the training, edification and inspiration of people who are interested in and concerned with Christian principles and concepts." The original deed covenants prohibit property owners from knowingly renting or leasing to persons with questionable moral character, require that notice and an option to purchase be given to the Council before any transfer of the land, reserve "the fee in all the avenues, streets and alleys," and provide that "the by-laws and regulations, ordinances and community rules which have been, or hereafter may be, from time to time, adopted" by the governing body are "binding upon all owners and occupants" in the Assembly. Our study, as directed by *Long,* of the deed covenants and other documents creating similar restrictions reveals that the parties' intent was for the Council to retain significant control over minute aspects of the Assembly, including the character of people who may live there, the usage and development of common areas, and the future creation of further governing standards to preserve and maintain the Christian character of the Assembly. With these intentions in mind, we proceed to consider the covenant amendments that are the basis of the contested service charges for defendant Huffman and defendants Emerson.

This Court has held that the enforceability of amendments to real covenants depends on whether the amendments are reasonable. *Armstrong,* 360 N.C. at 548, 633 S.E.2d at 81. In *Armstrong v. Ledges Homeowners Ass'n,* as in the instant case, an incorporated community group exercised its authority to augment original real covenants in order to subject property owners to fees for maintenance of the

community. As here, property owners in *Armstrong* disputed the enforceability of the amended covenants requiring them to pay the maintenance fees. In our opinion, this Court recognized that "[d]eclarations of covenants that are intended to govern communities over long periods of time are necessarily unable to resolve every question or community concern that may arise during the term of years." *Id.* at 557, 633 S.E.2d at 86 (citing 2 James A. Webster, Jr., *Webster's Real Estate Law in North Carolina* § 18-10, at 858 (Patrick K. Hetrick & James B. McLaughlin, Jr. eds., 5th ed. 1999)). On the other hand, we cautioned that "[a] covenant represents a meeting of the minds and results in a relationship that is not subject to overreaching by one party or sweeping subsequent change." *Id.* at 554, 633 S.E.2d at 84-85. We thus identified the tension "between the legitimate desire of a homeowners' association to respond to new and unanticipated circumstances and the need to protect minority or dissenting homeowners by preserving the original nature of their bargain." *Id.* at 558, 633 S.E.2d at 87 (citations omitted). We resolved this tension by holding that, to be enforceable, "amendments to a declaration of restrictive covenants must be reasonable. Reasonableness may be ascertained from the language of the declaration, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community." *Id.* at 548, 633 S.E.2d at 81. In short, this Court established in *Armstrong* that such amendments are enforceable if they are "reasonable in light of the contracting parties' original intent." *Id.* at 559, 633 S.E.2d at 87 (emphasis omitted).

In considering "the legitimate expectations of [the] lot owners" in *Armstrong, id.* at 560, 633 S.E.2d at 88, this Court emphasized that, at the time the plaintiff property owners purchased their lots, the community contained "no common areas or amenities," *id.* at 548-49, 633 S.E.2d at 81, and that "[n]either the Declaration nor the plat shows any source of common expense," *id.* at 560, 633 S.E.2d at 88. The plaintiffs in *Armstrong* professed a specific desire to live in a community lacking amenities for which they did not wish to pay, and they believed at the time of purchase that The Ledges was such a community. *Id.* at 552, 633 S.E.2d at 83. This Court agreed that the plaintiffs "purchased their lots without notice that they would be subjected to additional restrictions on use of the lots and responsible for additional affirmative monetary obligations imposed by a homeowners' association" and therefore, concluded that it would be unreasonable to enforce the amended covenants against them and require them to pay the disputed fees. *Id.* at 561, 633 S.E.2d at 88-89.

The Assembly stands in stark contrast to the community at issue in *Armstrong*. Whereas The Ledges community had only existed for about fifteen years when that controversy arose and was a fairly typical subdivision, the Assembly has existed for nearly a century and has spent that entire time purposefully developing its unique, religious community character. To that end, the Council and its predecessors have subjected the Assembly's residential lots to a wide variety of detailed restrictions, and they have done so consistently since the first lots were sold. Since the Assembly's establishment, all deeds conveying land within the community have included covenants requiring compliance with the bylaws, rules, and regulations periodically adopted by the Council. Indeed, the covenants incorporated in all defendants' deeds are nearly identical to one another. In purchasing property in the Assembly, defendants presumably desired to take advantage of the Assembly's exceptional community atmosphere, and in order to preserve that atmosphere, they were willing to relinquish significant ownership rights and give the Council substantial control over the community. While the current Regulations were not yet in existence at the time of the original conveyances here, the original intent of the parties was to bind all purchasers of property within the Assembly to any rules the Council deemed necessary to preserve the unique religious character and history of the community. In enacting the Regulations, therefore, the Council was acting in a manner that defendant Huffman and defendants Emerson could reasonably have anticipated.

Also, regardless of whether their deeds explicitly required them to pay the annual service charges, all defendants in the case *sub judice* purchased property in the Assembly with knowledge of the development's extensive amenities and were thus aware of many potential sources of common expense. In light of defendants' desire to avail themselves of the Assembly's various facilities and conveniences, and their willingness to subject their property ownership to numerous restrictions aimed at preserving the amenities for residents' continued enjoyment, their "legitimate expectations," *id.* at 560, 633 S.E.2d at 88, should have included an understanding that the Council might amend those covenants to generate the funds necessary for maintenance of the Assembly.

In addition to defendants' expectations, we must also consider the legitimate needs of the Council. *Id.* In that regard, we note that the purposes for the service charges, which include police protection, street maintenance, and upkeep of common areas, are eminently

SOUTHEASTERN JURISDICTIONAL ADMIN. COUNCIL, INC. v. EMERSON

[363 N.C. 590 (2009)]

reasonable community expenses. We are persuaded that it was permissible for the Council to respond to conditions by requiring Assembly residents to contribute financially to the maintenance of their community.

[2] Having concluded that it was reasonable to amend the covenants to institute the disputed service charges, it remains for us to determine whether those amended covenants are enforceable as written. To be enforceable, the covenants imposing the service charges must be subject to standards by which courts can measure the property owners' liability to pay the charges, must identify with particularity the properties to be maintained, and must provide guidance to courts reviewing the Council's decision as to which properties and facilities will be kept up with the proceeds. *See, e.g., Beech Mountain Prop. Owner's Ass'n v. Seifart*, 48 N.C. App. 286, 295-96, 269 S.E.2d 178, 183 (1980). Our review of the record reveals that a list of Policies and Procedures distributed to Assembly residents explains how the Council determines property values for purposes of assessing service charges and describes the procedure for establishing the applicable millage rate. Meanwhile, the Regulations (or, in the case of the Hickory Hill subdivision, the deeds) contain an itemized description of the purposes for the assessments, which are limited to common expenses such as police protection, street maintenance, and upkeep of common areas. We hold that the covenants imposing the disputed service charges, in tandem with supporting documentation, provide sufficient guidance to enable courts to enforce the covenants. We therefore hold those covenants enforceable against defendants.

Defendants Patten argue further that the service charges collected pursuant to the declaration of covenants that is incorporated in their deed may only be used for the benefit of the property that is explicitly subject to the terms of that declaration. Clause I of the declaration describes the subject property as "Hickory Hill, section one" ("Section One"). Section One is a portion of the Hickory Hill subdivision containing only four lots. The declaration goes on to state: "No property other than that described above shall be deemed subject to this Declaration, unless specifically made subject thereto." Defendants Patten rely on this provision ("the limiting provision") in contending that the Council has violated the declaration by attempting to use service charges paid by defendants Patten to maintain portions of the Assembly outside Section One.

The declaration's service charge provision reads as follows: "Each owner shall pay annually a SERVICE CHARGE in an amount

fixed by the SEJ Administrative Council for garbage and trash collection, police protection, fire protection, street maintenance, street lighting and upkeep of common areas." This provision contains no language to indicate that the service charge proceeds may only be utilized to benefit the very small section of the Assembly named in the declaration. Moreover, the subdivision plat and the declaration make it abundantly clear that Hickory Hill is part of the greater Assembly. The plat reflects that Section One is part of the "Property of Lake Junaluska Assembly" and shows that all four Section One lots share at least one boundary with "Remaining Property of Lake Junaluska Assembly." The declaration likewise refers to Hickory Hill as part of the Assembly and states that one of the purposes of the covenants is "to enhance Lake Junaluska Assembly as a community of people, families, and homes of the high values in the Hebrew Christian faith." If any inference is to be drawn from the declaration regarding permissible uses of the service charge proceeds, it is that the parties intended the proceeds from Section One landowners to be used for the maintenance of the whole Assembly.

In circumscribing the property that is subject to the declaration, the limiting provision upon which defendants Patten rely merely acknowledges that the Council is binding a limited portion of the Assembly to the declaration's covenants. In no way does this provision limit which portions of the Assembly can reap the covenants' benefits. With respect to the service charges, the limiting provision establishes that the declaration does not bind the owners of any property outside Section One to pay the charges (unless such owners' property is "specifically made subject thereto").[3] The limiting provision does not, however, establish that service charge payments from Section One landowners cannot be used for the maintenance of portions of the Assembly outside Section One. For that reason, and because Hickory Hill is part of the Assembly, it is reasonable for purchasers of lots in Section One to share the Assembly's communal maintenance costs.

By virtue of living in the Lake Junaluska Assembly Development, all defendants have benefitted from the services and protection provided to the entire Assembly from the proceeds of the annual service

3. The paragraph that follows the limiting provision in the declaration reads: "The [Council] may, from time to time, subject additional real property to the conditions, restrictions, covenants, reservations, liens and charges herein set forth by appropriate reference hereto."

charges. Indeed, the safety, protection, and maintenance of the Assembly contribute to the overall atmosphere that induces potential buyers to purchase property there. Invalidating the source of funding for such services would only risk eroding the fundamental nature and character of a community that has existed and flourished since the beginning of the twentieth century. We reiterate that the assessments in this case were initiated for the purpose of paying reasonable and specific expenses associated with upkeep and maintenance of the entire Assembly.

In *Armstrong*, we stated that "broad assessments for the general purposes of promoting the safety, welfare, recreation, health, common benefit, and enjoyment of the residents of [a development] as may be more specifically authorized from time to time by the [development's governing body]" are unreasonable because they grant "practically unlimited power" to the governing body to assess property owners. 360 N.C. at 560-61, 633 S.E.2d at 88 (internal quotation marks omitted). Thus, the proceeds of the service charges must actually be used to fund the particular purposes stated in the restrictions. In their Answers, defendants questioned whether the assessment funds were used for development of the newer parts of the Assembly rather than for the purposes stated in the covenants. If defendants had been able to show that, despite the legitimate purposes stated in the covenants, the Council had in fact used the proceeds for specific, targeted projects such as building roads to develop new parts of the Assembly, the assessments would not be enforceable. However, given that the trial court did not make any determination on this issue before ruling on the motions for summary judgment, it appears that insufficient evidence was presented to the trial court to create a genuine issue of material fact whether the funds were used for improper purposes.

We hold that the amendments instituting the annual service charge assessments are reasonable and that the service charge provisions are enforceable against all defendants. We thus reverse the Court of Appeals' decision that the trial court erred in granting summary judgment to the Council. The remaining issues addressed in the Court of Appeals' opinion are not before this Court and its decision as to those issues remains undisturbed.

REVERSED.

Justice EDMUNDS concurring.

I concur with the majority holding that, in this case, the annual service charge assessments instituted under the restrictive covenants are reasonable and are enforceable against all defendants. I write separately to emphasize that the unique nature of Lake Junaluska is fundamental to that outcome. In the ordinary case, by contrast, a restrictive covenant purporting to bind all owners and occupants to future regulations that a developer might adopt would not be sufficient to make an assessment implemented decades later by the developer reasonable or enforceable.

A "fundamental premise" of real property law is that "[w]hile the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land." *J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc.*, 302 N.C. 64, 70, 274 S.E.2d 174, 179 (1981) (citations omitted). As the majority states, rules and regulations created pursuant to a restrictive covenant, like amendments to a declaration of restrictive covenants, must be reasonable. The reasonableness of such rules and regulations "may be ascertained from the language of the declaration, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community." *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 548, 633 S.E.2d 78, 81 (2006). The majority opinion properly highlights the contrast between the "fairly typical" subdivision at issue in *Armstrong* and the "unique, religious community character" of Lake Junaluska. Slip Op. at 12. This distinction is critical to the holding because I believe that, consistent with our analysis in *Long v. Branham*, 271 N.C. 264, 156 S.E.2d 235 (1967), in most cases affirmative obligations may not be imputed to real property owners when such obligations could not reasonably be anticipated. In a more typical subdivision where the developer does not retain significant control over minute aspects of the development, affirmative obligations adopted pursuant to a restrictive covenant that purports generally to bind all owners and occupants to rules and regulations that may be adopted at some future time by a developer ordinarily would not be reasonable.

For the reasons above, I concur in the majority opinion.

Justice HUDSON dissenting.

With respect to defendants Emerson and Huffman, the restrictive covenants at issue do not contemplate any affirmative financial assessment on defendants, and I conclude that the service charge contained in the 1996 Rules and Regulations therefore exceeds the scope of the original bargain. As for defendants Patten, the applicable restrictive covenants do explicitly provide for assessment of service charges, but I conclude that the language is not sufficiently definite to be enforceable under North Carolina law. For these reasons, I respectfully dissent.

The majority and concurring opinions emphasize "the unique, religious community character" of the Lake Junaluska Assembly Development (the "Assembly") as "fundamental" to the holding that the amendments to the restrictive covenants here are reasonable, even going so far as to take judicial notice of facts not in the record to support that position. However, the Southeastern Jurisdictional Administrative Council (SEJAC) has advanced no argument for an exception for religious communities, in either its original complaints against defendants or its briefs to the Court of Appeals and this Court. Moreover, neither the majority or dissenting opinions below discussed such an exception. Rather, this dispute has been presented by all parties as an ordinary dispute between a commercial property developer and its property owners, and I can discern no basis for us to treat it otherwise. Indeed, I have found no statutory or case law that would support an expansive reading of restrictive covenants only here, based on the presumably religious nature of the community. I do not believe it is appropriate for us to reach out and resolve this case on grounds not argued, particularly when doing so requires the Court to consider matters not in the record. On this point, I also dissent.

The facts are straightforward and require us to look only at the language of the deeds signed by the parties here, including the applicable restrictive covenants. Given that the language of the deeds and covenants is plain and unambiguous, we have no need to refer to the history of SEJAC or even to the parties' relationship, in order to infer their respective intentions at the times the deeds were signed. *See Long v. Branham*, 271 N.C. 264, 276, 156 S.E.2d 235, 244 (1967) ("The fundamental rule in construing restrictive covenants is that the intention of the parties *as shown by the covenant* governs." (emphasis added) (citation and internal quotation marks omitted))).

As we have previously held, this Court will generally enforce a restrictive covenant in the same manner as any other contract. *Wise v. Harrington Grove Cmty. Ass'n*, 357 N.C. 396, 400-01, 584 S.E.2d 731, 735-36 (2003); *see also Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 554, 633 S.E.2d 78, 85 (2006) ("Covenants accompanying the purchase of real property are contracts which create private incorporeal rights, meaning non-possessory rights held by the seller, a third-party, or a group of people, to use or limit the use of the purchased property." (citations omitted)). As such, "[i]f the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (citation and internal quotation marks omitted).

While the majority speculates as to the reason defendants Emerson and Huffman purchased their respective lots in the Lake Junaluska Assembly Development, our cases show that we must restrict our determination of the "intention of the parties" based only on our "study and consideration of *all* the covenants . . . creating the restrictions." *Long*, 271 N.C. at 268, 156 S.E.2d at 238 (citation omitted); *cf. id.* at 268, 156 S.E.2d at 239 ("Where the meaning of restrictive covenants is doubtful the surrounding circumstances existing at the time of the creation of the restriction are taken into consideration in determining the intention." (citation and internal quotation marks omitted)).

Accordingly, as with any contract, the written words of the parties, not our own theories as to their respective motivations, must underlie our analysis of the bargain they struck. We have also previously held that, because of the unique nature of restrictive covenants:

> Covenants and agreements restricting the free use of property are *strictly construed* against limitations upon such use. Such restrictions *will not be aided or extended* by implication or enlarged by construction to affect lands not specifically described, or to grant rights to persons in whose favor it is not clearly shown such restrictions are to apply. Doubt will be resolved in favor of the unrestricted use of property, . . . and that construction should be embraced which least restricts the free use of the land.

> Such construction in favor of the unrestricted use, however, must be reasonable. The strict rule of construction as to restric-

tions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction.

*Id.* at 268, 156 S.E.2d at 239 (emphases added) (citation and internal quotation marks omitted). Likewise, in *Armstrong* we recently held that an amendment to a declaration of covenants "does not permit amendments of unlimited scope; rather, every amendment must be reasonable in light of the contracting parties' original intent." 360 N.C. at 559, 633 S.E.2d at 87.

The *Armstrong* case is instructive to the analysis of the situation presented here. In *Armstrong*, we considered a challenge by property owners to their homeowners' association's amendment of a declaration of restrictive covenants so as to "authorize[] broad assessments 'for the general purposes of promoting the safety, welfare, recreation, health, common benefit, and enjoyment of the residents of [the subdivision] as may be more specifically authorized from time to time by the Board.' " *Id.* at 548, 633 S.E.2d at 81. There, we noted disapprovingly that the amendment "grants the [homeowners'] Association practically unlimited power to assess lot owners and is contrary to the original intent of the contracting parties," in part because the assessments billed were "unrelated to all other provisions of the deeds, Declaration, and plat." *Id.* at 561, 633 S.E.2d at 88. In finding the amendment to be invalid and unenforceable, we concluded that "[i]n the same way that the powers of a homeowners' association are limited to those powers granted to it by the original declaration, an amendment should not exceed the purpose of the original declaration." *Id.* at 558, 633 S.E.2d at 87.

In *Armstrong*, we also highlighted the unexpected nature of the assessments, observing that "petitioners purchased their lots without notice that they would be subjected to additional restrictions on use of the lots and responsible for additional affirmative monetary obligations imposed by a homeowners' association." *Id.* at 561, 633 S.E.2d at 89. Significantly, we emphasized the importance of respecting the parties' expectations regarding the original bargain struck, stating unequivocally that "[t]his Court will not permit the Association to use the Declaration's amendment provision as a vehicle for imposing a new and different set of covenants, thereby substituting a new obligation for the original bargain of the covenanting parties." *Id.*

Here, defendants Emerson and Huffman agreed to the following restrictive covenants when they signed their respective deeds:

Second: That said lands shall be held, owned, and occupied subject to the provisions of the charter of the [Lake Junaluska Assembly, Inc.], and all amendments thereto, heretofore, or hereafter enacted, and to the bylaws and regulations, ordinances and community rules which have been, or hereafter may be, from time to time, adopted by [Lake Junaluska Assembly, Inc.], and its successors.

. . . .

Fifth: That it is expressly stipulated and covenanted between the Grantor and the Grantee, his heirs and assigns, that the bylaws, regulations, community rules and ordinances heretofore or hereafter adopted by the [Lake Junaluska Assembly, Inc.] shall be binding upon all owners and occupants of said lands as fully and to the same extent as if the same were fully set forth in this Deed, and that all owners and occupants of said lands and premises shall be bound hereby.

Defendant Huffman purchased his lots in 1970 and 1974; defendants Emerson purchased their lot in 1992. In November 1996, the Assembly enacted Rules and Regulations[4] providing in part: "Each owner shall pay annually a SERVICE CHARGE in an amount fixed by the SEJ Administrative Council for police protection, street maintenance, street lighting, drainage maintenance, administrative costs and upkeep of the common areas." Put simply, years after defendants struck their original bargains with SEJAC—and, in the case of defendant Huffman, decades later—SEJAC amended the restrictive covenants to impose affirmative financial obligations on defendants. Thus, when defendants Emerson and Huffman decided to purchase, and struck their original bargains, they had before them only the language of the original covenants, which make no mention of financial assessments.

Given that the restrictive covenants contain absolutely no reference to even the possibility of assessments or fees to be paid by prop-

---

4. I note that the majority opinion does not address defendants' argument that the 1996 Rules and Regulations are not an enforceable amendment to the covenants because they are contained in a private document that has not been recorded. *See Armstrong*, 360 N.C. at 555, 633 S.E.2d at 85 ("An enforceable real covenant is made in writing, properly recorded, and not violative of public policy." (citations omitted)); *Hege v. Sellers*, 241 N.C. 240, 248, 84 S.E.2d 892, 898 (1954) (stating that real covenants must be recorded). Because I would find the service charges to be unenforceable regardless, I have not discussed this point.

erty owners, I disagree that defendants Emerson and Huffman "should have anticipated" this action by the Assembly. Likewise, in light of our holding in *Armstrong* and our case law directing that such covenants be strictly construed against limitations on use of property, I cannot agree with the majority that this amendment is reasonable and within the scope of the original restrictive covenants agreed to by the parties. Indeed, this amendment appears to be precisely the type of "overreaching by one party or sweeping subsequent change" that we cautioned against in *Armstrong*. 360 N.C. at 554, 633 S.E.2d at 84-85. I believe that the majority's holding here today dilutes beyond usefulness the reasonableness standard that we articulated in *Long* and *Armstrong*.

The entire passage from *Armstrong* explaining how "reasonableness" may be determined is informative:

> However, the court may ascertain reasonableness from the language of the original declaration of covenants, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community. For example, it may be relevant that a particular geographic area is known for its resort, retirement, or seasonal "snowbird" population. Thus, it may not be reasonable to retroactively prohibit rentals in a mountain community during ski season or in a beach community during the summer. Similarly, it may not be reasonable to continually raise assessments in a retirement community where residents live primarily on a fixed income. Finally, a homeowners' association cannot unreasonably restrict property rental by implementing a garnishment or "taking" of rents (which is essentially an assessment); although it may be reasonable to restrict the frequency of rentals to prevent rented property from becoming like a motel.
>
> Correspondingly, restrictions are generally enforceable when clearly set forth in the original declaration.

*Id.* at 559-60, 633 S.E.2d at 88. We made these observations in the context of our concern that, with homeowners' associations in general, "[t]he law . . . not subject a minority of landowners to unlimited and unexpected restrictions on the use of their land merely because the covenant agreement permitted a majority to make changes in existing covenants." *Id.* at 561, 633 S.E.2d at 89 (citation and internal quotation marks omitted).

Here, that concern is even greater, as SEJAC is the corporate property developer; there is no homeowners' association or other representative vehicle through which defendants and other property owners could vote to approve or strike down amendments to the original covenants. "[R]etaining significant control over minute aspects of the Assembly" is not equivalent to charging property owners monthly assessments, sometimes totaling thousands of dollars a year, that were not contemplated, and therefore, not agreed to, in the original contracts signed by the parties.

The majority opinion distinguishes the facts here from those in *Armstrong* by focusing on the "unique, religious community character" of the Assembly, as opposed to the "fairly typical subdivision" at issue in *Armstrong*. Our analysis in *Armstrong* was based not only on the nature of the community in question, but also in large part on the expectations of the property owners themselves as to future financial obligations at the time they purchased their lots. While it is true that we quoted two of the six petitioners in *Armstrong* regarding their express decision not to live in "a gated community with 'all the amenities,' " *id.* at 552, 633 S.E.2d at 83, we did so to illustrate their opposition to the notion of living in a planned community in light of the homeowners' association's repeated references to North Carolina's Planned Community Act in its attempts to amend the bylaws.

Significantly, the original declaration of covenants in *Armstrong* did, in fact, allow property owners to be assessed for "an equal pro-rata [sic] share of the common expense for electrical street lights and electrical subdivision entrance sign lights and any other common utility expense for various lots within the Subdivision." *Id.* at 550, 633 S.E.2d at 82. Even with that language, which gave property owners notice that they were subject to future financial obligations related to their lots, this Court found an amendment expanding the assessments to be invalid and unenforceable. Here, purchasers of Assembly property had no such notice. Further, I see no distinction between the new affirmative obligations this Court struck down in *Armstrong* for " 'promoting the safety, welfare, recreation, health, common benefit and enjoyment' " of residents, *id.* at 553, 633 S.E.2d at 84, and those that the majority would allow here, as "necessary to preserve the unique religious character and history of the community." Neither the majority nor the concurring opinion articulates a legal basis or cites any authority for the proposition that the development corporation managing this community should be permitted

to infringe upon the individual property rights of its property owners in a manner that would be impermissible for any other developer.

Here, the parties have not argued in their briefs, nor does anything in the record before us give any indication, why defendants Emerson and Huffman elected to purchase property in the Assembly. We do have their sworn affidavits that their deeds contain no reference to "any charges or assessments by Lake Junaluska Assembly, Inc." and that the reference to the " 'bylaws and regulations, ordinances and community rules' " is "too vague to give any notice of an obligation to pay money for anything." Perhaps they purchased their lots because they were attracted to the Assembly's "unique, religious community character" or maybe they did so because they expected that the community would be fully maintained by SEJAC, without any additional financial burden on them as property owners. Neither the briefs nor the record reflect why they made their decisions to purchase, and we simply do not know. In light of well-established principles requiring strict construction of covenants, I do not agree that we should allow speculation as in the majority opinion to form the basis of a decision to expand these covenants.

Although amendments are sometimes necessary, as we recognized in *Armstrong*, they must be reasonable and "preserv[e] the original nature of [the parties'] bargain." *Id.* at 558, 633 S.E.2d at 87 (citations omitted). The majority's holding allows the Assembly to infringe on the individual property rights of defendants Huffman and Emerson by amending the original covenants in a manner that impermissibly "substitute[s] a new obligation for the original bargain of the covenanting parties." *Id.* at 561, 633 S.E.2d at 89. Further, it runs contrary to our long-standing case law directing such covenants to be strictly construed. I would find the amendments to be invalid and unenforceable.

Defendants Patten are differently situated than defendants Emerson and Huffman, as the Pattens purchased their lot in 1996, at which point the covenants included the following language: "Each owner shall pay annually a <u>SERVICE CHARGE</u> in an amount fixed by the SEJ Administrative Council for garbage and trash collection, police protection, fire protection, street maintenance, street lighting, and upkeep of common areas." Thus, defendants Patten had notice that they owed an ongoing financial obligation to the Assembly for those services.

In *Armstrong*, we cited with approval the Court of Appeals holding in *Beech Mountain Property Owner's Ass'n v. Seifart*, 48 N.C. App. 286, 269 S.E.2d 178 (1980), that affirmative covenants are unenforceable "unless the obligation [is] imposed in clear and unambiguous language which is sufficiently definite to guide the courts in its application." 360 N.C. at 556, 633 S.E.2d at 85 (quoting *Beech Mountain*, 48 N.C. App. at 295, 269 S.E.2d at 183 (alteration in original)). In *Beech Mountain*, the Court of Appeals articulated a three-part test to determine if an obligation is "sufficiently definite": Does the covenant (1) describe an adequate standard to determine the amount of the assessment; (2) identify with particularity the property to which the assessment applies; and (3) give guidance to the reviewing court regarding the facilities maintained with the assessment funds? 48 N.C. App. at 295-96, 269 S.E.2d at 183-84.

Here, the deed and covenants signed by defendants Patten refer to their subdivision, Hickory Hill, but also include references to the larger Assembly development. Each property owner in the Assembly receives a copy of policies and procedures outlining how the service charges are calculated using property values, and I find that explanation sufficient to meet the first prong of the test.

Turning to the second and third prongs, I find that the language in the covenants gives no guidance on the property or facilities that will be maintained with the assessment funds. Although defendants Pattens' deed specifies that it subjects Section One of the Hickory Hill subdivision to the covenants therein, nothing in the service charge description specifies that the assessment funds will be used for the Assembly Development as a whole, or even limited to use only in the Assembly. From the documents in the record, it is clear that the service charges are being used for maintenance and upkeep throughout the Assembly Development as a whole, which, without operative language to allow for such application, goes beyond what our case law permits. *See Long*, 271 N.C. at 274, 156 S.E.2d at 243 ("It is our opinion, however, that, nothing else appearing, restrictions imposed upon a particular subdivision are for the benefit of that particular development and no other.").

Moreover, although the service charge includes a reference to "common areas," Mitchell Buddy Young, SEJAC's Director of Residential Services at the Assembly, admitted in his deposition that there are no common area fees, a fact which was also admitted in SEJAC's responses to interrogatories. Likewise, defendants Patten

also pay a separate monthly fee for garbage and trash collection and fire protection. Thus, as to at least some of the "eminently reasonable community expenses" highlighted by the majority opinion, defendants are already contributing financially "to the maintenance of their community" through other monthly charges. More troubling, SEJAC in its response to interrogatories, and Mr. Young in his deposition, conceded that the service charge assessed to defendants Patten is also used for administrative costs (including payroll, pension and retirement benefits, and attorney's fees), which are not purposes mentioned explicitly or by implication in the covenants.

As the majority opinion itself observes, "the proceeds of the service charges must actually be used to fund the specific purposes stated in the restrictions." Here, by SEJAC's own admission, they are not. Moreover, the deed contains no language limiting the property or facilities to which the service charge may be applied, again giving SEJAC unfettered discretion to continue to expand the streets, lighting, and other areas that might be maintained using the service charges. If this language is sufficiently definite to be enforceable, defendants Pattens' liability could be virtually unlimited. Similarly, the covenants struck down in *Beech Mountain* required an assessment for "road maintenance and maintenance of the trails and recreational areas," "road maintenance, recreational fees, and other charges assessed by the Association," and "all dues, fees, charges, and assessments made by that organization, but not limited to charges for road maintenance, fire protection, and security services," without specifying which roads, trails, or areas in the development were covered. 48 N.C. App. at 288, 269 S.E.2d at 179-80. I find the language here to be at least as vague and would affirm the Court of Appeals in reversing summary judgment against defendants Patten.

For the foregoing reasons, I would hold that the restrictive covenants and the 1996 Rules and Regulations at issue here impermissibly infringe on the property rights of defendants. I therefore respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.