IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-201

No. COA21-98

Filed 5 April 2022

Granville County, No. 19-CVS-229

ANTONIO LAMAR BRYAN and wife UVETIA BRYAN, Plaintiffs,

v.

WILLIAM KITTINGER and wife HANNAH SUH KITTINGER, Defendants.

Appeal by Defendants from judgment entered 9 December 2019 by Judge Alma Hinton in Granville County Superior Court. Heard in the Court of Appeals 20 October 2021.

*Wilkinson & Carpenter, P.A., by A. Chance Wilkinson, for the Plaintiffs-Appellees.*

*Adams and Reese LLP, by Lydney R. Z. Bryant, for the Defendants-Appellants.*

DILLON, Judge.

"The issue is, what is chicken?" This is the opening line in *Frigaliment Importing Co. v. B. N. S. Int'l Sales Corp.*, 190 F. Supp. 116, 117 (S.D.N.Y 1960), a case studied by most law students when learning about principles of interpreting contract provisions. This present appeal involves the fate of four chickens and whether their presence in a residential planned community violates the private restrictive covenants governing that community.

## I. Background

Plaintiffs and Defendants are next-door neighbors in the Sleepy Hollow Subdivision, a planned community established in 1998.

In 2016, Defendants moved into a house in Sleepy Hollow. They keep four hens (female chickens) in a coop in their backyard.

In 2018, Plaintiffs commenced this action to enjoin Defendants from keeping the hens, claiming that their presence violated Sleepy Hollow's restrictive covenants prohibiting the keeping of "poultry" and that their presence otherwise constituted a nuisance. Defendants answered, admitting to keeping the chickens but denying that their presence violated the covenants or constituted a nuisance.

In late 2019, the trial court granted Plaintiffs' summary judgment motion, concluding that the chickens violated the covenants as a matter of law, and enjoined Defendants from keeping them at their home.

However, in early 2020, Sleepy Hollow recorded an amendment to their covenants that allows each homeowner to keep up to five (5) hens for non-commercial use. Based on this new covenant, Defendants sought relief from the injunction. The trial court concluded that the 2020 covenant was not valid and denied the motion.

Defendants timely appealed.

## II. Analysis

The trial court's order granting summary judgment was based on its

interpretation that owning chickens violated Sleepy Hollow's covenants that were recorded in 1998 (hereinafter the "1998 covenant"). The trial court made no determination as to whether their presence otherwise constituted a nuisance. Accordingly, the nuisance claim is not before us.

¶ 9 On appeal, Defendants argue that the trial court erred in granting Defendants' motion for summary judgment and denying their subsequent motion based on the new covenant. We address each in turn.[1]

### A. Granting Plaintiffs' Summary Judgment Motion

Our standard of review from an order granting summary judgment is *de novo*. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

¶ 10 In its summary judgment order, the trial court concluded that the presence of the hens in Defendants' backyard violated the 1998 covenant which prohibited the keeping of poultry on one's property. Specifically, the covenant provides as follows:

> No animals, livestock or poultry of any kind shall be raised,
> bred or kept on the building site, except that dogs, cats or
> other household pets may be kept, provided that they are
> not bred or maintained for any commercial purpose.

Because the first clause states that no "poultry of any kind" is allowed, the trial court concluded that Defendants' hens were in violation. But the court did not consider

---

[1] On appeal, Defendants also argue that the trial court erred in denying their Rule 12(b)(6) motion concerning Plaintiffs' claim based on the 1998 covenant. We disagree, concluding that Plaintiffs adequately stated this claim in their complaint.

whether the fowl fell under the "household pets" language in the second clause.

¶ 11        As we evaluate this 1998 covenant, we are cognizant of the following principles

from our Supreme Court regarding the interpretation of private restrictive covenants:

¶ 12        We are "to give effect to the original intent of the parties[.]" *Armstrong v.*

*Ledges Homeowners Ass'n*, 360 N.C. 547, 555, 633 S.E.2d 78, 85 (2006). But if there

is ambiguity in the language, the covenant is to be "strictly construed in favor of the

free use of land[.]" *Id.* at 555, 633 S.E.2d at 85 (emphasis in original). This "rule of

strict construction is grounded in sound considerations of public policy: It is in the

best interests of society that the free and unrestricted use and enjoyment of land be

encouraged to its fullest extent." *J.T. Hobby & Sons v. Family Homes Inc.*, 302 N.C.

64, 71, 274 S.E.2d 174, 179 (1981). However, as parties have the freedom to agree on

restrictions in their neighborhood, the canon favoring the free use of land "should not

be applied in such a way as to defeat the plain and obvious purposes of a restriction."

*Southeastern Jurisdictional Admin. Council, Inc. v. Emerson*, 363 N.C. 590, 595, 683

S.E.2d 366, 369 (2009) (citation omitted).

¶ 13        Turning to the 1998 covenant, we conclude that the keeping of poultry is clearly

forbidden by the covenant's first clause, as chickens are "poultry." However, we must

determine whether the covenant's second clause could reasonably be construed to

allow poultry if kept as "household pets." We conclude that it does: While the first

clause forbids the keeping of any "animals," the second clause clearly allows the

keeping of animals, so long as they are "household pets" and otherwise not used for a commercial purpose. In the same way, where the first clause forbids the keeping of "poultry," the second clause could be reasonably read to allow poultry—which, we note, are animals—kept as "household pets" and otherwise not kept for any commercial purpose.

¶ 14    This case is similar to *Steiner v. Windrow Estates Home Owners Ass'n*, 213 N.C. App. 454, 713 S.E.2d 518 (2011). In that case, our Court determined that two Nigerian Dwarf goats could fall within a "household pet" exception of a restrictive covenant. The covenant in that case provided that "[n]o animals, livestock or poultry of any kind shall be raised, bred or kept on any lot except that horses, dogs, cats or other [household] pets may be kept provided they are not kept, bred, or maintained for any commercial purposes[.]" *Id.* at 459, 723 S.E.2d at 522. We held that this covenant allowed "virtually *any animal* which may be treated as a 'household pet' to be kept on the homeowner's property[.]" *Id.* at 464, 713 S.E.2d at 525 (emphasis added). We further held that the term "household pets" could include pets kept outdoors in the yard. *Id.* at 462, 723 S.E.2d at 525 (explaining why "the fact that the goats do not literally live *inside* the house [is not] dispositive of the issue").

¶ 15    Though we conclude that the keeping of hens is not *per se* forbidden by the 1998 covenant, we also conclude that *Defendants* were likewise *not* entitled to summary judgment. There is still a genuine issue as to whether they indeed keep

their hens as household pets and not otherwise for any commercial purpose. It is true that Defendants put on evidence tending to show that they consider their hens as household pets and that they do not sell the eggs laid by the hens. But our Supreme Court has instructed that a summary judgment motion should "ordinarily be denied even though the opposing party makes no response" where the "witness is inherently suspect [ ] because he is interested in the outcome of the case and the facts are peculiarly within his knowledge." *Kidd v. Early*, 289 N.C. 343, 366, 222 S.E.3d 392, 408 (1976). Here, though Defendants state that they consider their hens as pets, the fact-finder could disbelieve them. In any event, Plaintiffs did put on evidence that the only interaction Defendants have with the hens is when Defendants retrieve eggs from the coop.

### B. Denial of Defendants' Rule 59/Rule 60(b)(5) Motion

In early 2020, an amendment to Sleepy Hollow's covenants was recorded that allows each homeowner to keep up to five (5) hens. Based on this amendment, Defendants sought relief from the injunction contained in the 2019 summary judgment. Defendants cited Rule 60(b)(5) of our Rules of Civil Procedure that allows relief where "it is no longer equitable that the judgment should have prospective application."

In denying the motion, the trial court concluded that the 2020 covenant was not valid because it had not been "properly executed." The trial court erroneously

recognized Defendants' motion as one made under Rule 59, which allows "[a] motion to alter or amend the judgment" in certain situations, rather than under Rule 60(b)(5). *See Doe v. City of Charlotte*, 273 N.C. App. 10, 15-16, 848 S.E.2d 1, 6 (2020) (recognizing that "Rule 59 is not an appropriate means of seeking reconsideration of interlocutory, pre-trial rulings of the trial court").

¶ 18 Our standard of review, however, is the same whether the motion was one made under Rule 59 or Rule 60. *Davis v. Davis*, 360 N.C. 518, 523, 631 S.E.2d 114, 118 (2006) ("As with Rule 59 motions, the standard of review of a trial court's denial of a Rule 60(b) motion is abuse of discretion.")

¶ 19 In 2020, Sleepy Hollow recorded an amendment to its covenants that allows each homeowner to "keep up to five (5) hens provided that they are not bred or maintained for any commercial purpose." The recorded document was executed by eleven (11) individuals, each of whom own a different lot in Sleepy Hollow.

¶ 20 The trial court's determination that the covenant was not properly executed was based on the interplay of two statutes: N.C. Gen. Stat. § 47F-2-117 (2018) and N.C. Gen. Stat. § 41-58 (2018).

¶ 21 Subsection (a) of Section 47F-2-117 provides that a declaration may be amended "by affirmative vote or written agreement signed by lot owners of lots to which at least sixty-seven percent (67%) of the votes in the association are allocated[.]" Subsection (d) provides that "[a]ny amendment passed pursuant to the

provisions of this section or the procedure provided for in the declaration are presumed valid and enforceable."[2]

¶ 22    Sleepy Hollow is made up of sixteen (16) lots.[3]  Accordingly, the affirmative vote of eleven (11) lot owners would be needed to amend a covenant under Section 47F-2-117(a).[4]  The 2020 covenant was signed by eleven (11) individuals, each purportedly having an ownership in a different lot within Sleepy Hollow.

¶ 23    As the 2020 covenant is "presumed valid," the burden is on Plaintiffs to show why it is not.  The only argument advanced by Plaintiffs that the 2020 covenant is

---

[2] This right to amend covenants in this manner, though, is not unfettered.  Our Supreme Court has held that only those amendments which are "reasonable" are enforceable. *Southeastern v. Emerson*, 363 N.C. 590, 596-97, 683 S.E.2d 366, 370 (2009).

[3] Neither party argues that Sleepy Hollow, which was established in 1998, is not a "planned community" subject to some of the provisions of the Planned Community Act, enacted in 1999.  Section 47F-1-102(b)(1) states that the Act is not applicable to planned communities established *in or after 1999* with 20 or less lots.  Section 47F-1-102(c), however, subjects planned communities established before 1999 to certain provisions of the Act, without any language limiting its application to only those older communities with more than 20 lots.

Indeed, perhaps because it is not a contested issue on appeal it is not clear from the Record whether Sleepy Hollow is, in fact, a "planned community" as defined by the Act.  The Act requires that for a neighborhood to be considered a planned community, its lot owners must "expressly [be] obligated by a declaration to pay [at least some] expenses to maintain, improve, or benefit other lots[.]"  N.C. Gen. Stat. § 47F-1-103(23).  It is unclear if the lot owners are obligated to pay for any such expenses.  But we note that the 1998 covenants are self-described as a "Declaration" and contain a provision that the "individual lot owners" may be required to make "continuing monthly payments" for the maintenance of "underground electric cables" and "street lighting."  As the parties make no argument that Sleepy Hollow does not fit the Act's definition of a "planned community," and as it does not appear otherwise from the Record, we assume for purposes of this appeal that Sleepy Hollow fits the Act's definition.

[4] The vote would pass the threshold at 68.75%.

*not* valid is based on their contention that some of those who signed the covenant own their lots as tenants by the entireties with their respective spouses. Plaintiffs rely on Section 41-58, which provides that "[n]either spouse may . . . encumber any property held by them as tenants by the entirety without the written joinder of the other spouse." It was on this basis that the trial court denied Defendants' motion.

¶ 24 Defendants, though, argue that the consent of the spouses is not required based on another provision of the Planned Community Act, which allows one owner of a lot to bind his co-owner(s) when voting on a matter at a meeting of the association if the co-owner(s) choose not to be present at the meeting:

> If only one of the multiple owners of a lot is present at a meeting of the association, the owner who is present is entitled to cast all the votes allocated to that lot. If more than one of the multiple owners are present, the votes allocated to that lot may be case only in accordance with the agreement of a majority in interest of the multiple owners[.]

N.C. Gen. Stat. § 47F-3-110(a).

¶ 25 We hold that the trial court did not err for the following reasoning.

¶ 26 Section 47F-2-117 states that an amended covenant may be adopted by *either* "affirmative vote" *or* by "written agreement." We note that the Planned Community Act does not require those in favor of amendment, under either method, to execute the document that is ultimately recorded. *See* N.C. Gen. Stat. § 47F-2-117(e) (describing how the recorded document may be executed).

¶ 27 When an amendment is sought by vote at a duly called meeting, one spouse may bind the other where the other chooses not to attend, pursuant to Section 47F-3-110(a). We do not think that Section 41-58 would have any application to prevent this result since there is no requirement in the Planned Community Act that *any* owner sign anything to cast an affirmative vote and the spouse's signature is not otherwise required on the instrument to be recorded.

¶ 28 The recorded 2020 covenant states its adoption was by "written agreement," with no indication that it was the product of a vote from a duly called meeting. And Section 47F-3-110(a) does not apply to attempts to amend covenants *by written agreement*, where other owners would not necessarily have notice and have an opportunity to dissent.[5]

¶ 29 And since a restrictive covenant is an encumbrance/interest on real estate, s*ee*

---

[5] Where one enters into a written agreement *as part of a duly called meeting*, such action may be considered an "affirmative vote" and therefore binding on the non-attending spouse. But there is no indication in the recorded instrument or otherwise that the written agreement was the result of a vote at a meeting.

We do not suggest that, where a single lot has multiple owners, the *only* way one owner could agree on behalf of the other owners is through a vote at a duly called meeting. For instance, the bylaws of the association or an agreement among the co-owners may authorize a single owner to vote on behalf of all co-owners through a written agreement. However, absent this sort of separate authorization, the Act does not allow proponents of an amendment to gain a vote of a lot by presenting a written agreement to only one of multiple co-owners. Otherwise, proponents of an amendment could bypass a potentially dissenting co-owner by procuring the signature of another co-owner on a written agreement. In any event, there is nothing in the Record before us that indicates, one way or the other, whether the married owners who signed the 2020 covenant had the authority to bind their spouses.

*Hege v. Sellers*, 241 N.C. 240, 248, 84 S.E.2d 892, 898 (1954) (holding that restrictive covenants fall within our Statute of Frauds), we hold that Section 41-58 applies. Indeed, there is nothing in the Planned Community Act that allows one owner to bind his co-owners outside of a vote taken at a duly called meeting. Otherwise, those in favor of an amendment could strip the right of a spouse/co-owner to dissent at a meeting by procuring the signature of the approving spouse on a written document outside of a called meeting.

¶ 30 We are not holding that the 2020 covenant is invalid. It may be that the covenant was voted on at a meeting. On remand, Defendants are free to move the trial court for leave to amend their answer to assert the 2020 amendment as a defense. However, the recorded document that was before the trial court and that is in our record states that the document was adopted by "written agreement." Accordingly, we cannot say that the trial court abused its discretion in denying Defendants' motion based on the 2020 amendment.

## III. Conclusion

¶ 31 We conclude that the 1998 covenant does not prevent a homeowner in Sleepy Hollow to keep hens as "household pets" and not otherwise for some "commercial purpose." There is a genuine issue of material fact on this issue. Accordingly, the trial court erred in granting summary judgment in favor of Plaintiffs.

¶ 32 We further conclude that the trial court did not err by denying Defendants'

motion for relief based on the 2020 covenant.[6]

We remand the matter for further litigation of Plaintiffs' claim based on the 1998 covenant and of Plaintiffs' private nuisance claim.[7]

AFFIRMED IN PART, VACATED IN PART, REMANDED.

Judges DIETZ and HAMPSON concur.

---

[6] Our holdings here are not binding on any other lot owner within Sleepy Hollow, as they are not parties to this action. We leave to the trial court and the parties on remand to examine whether, if appropriate, other lot owners should be joined as parties.

[7] In their complaint, Plaintiffs have essentially also alleged a private nuisance claim. Specifically, they have alleged that Defendants' owning of chickens "prevents and interferes in the Plaintiffs' lawful use and peaceful enjoyment of their property, and that said chickens create such noise as to interfere with the Plaintiffs' sleep and rest . . . and as a result thereof the Plaintiffs have incurred damages[.]" *See Jones v. Queen City Speedways, Inc.*, 276 N.C. 231, 239, 172 S.E.2d 42, 47 (1970) (recognizing a private action against a neighbor who is engaging in a lawful enterprise on her property but in a manner as to disrupt the plaintiff's ability to enjoy his property).