IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-302

Filed: 19 May 2020

Rutherford County, No. 16-CVS-588

CHAD POOVEY and ANGELA POOVEY, Plaintiffs,

v.

VISTA NORTH CAROLINA LIMITED PARTNERSHIP and APC TOWERS, LLC, Defendants,

v.

130 OF CHATHAM, LLC, et al., Nominal Defendants.

Appeal by plaintiffs from order entered 26 January 2018 by Judge J. Thomas Davis in Superior Court, Rutherford County. Heard in the Court of Appeals 2 October 2019.

> *Cannon Law, P.C., by William E. Cannon, Jr., Mark A. Wilson, and Tiffany F. Yates, for plaintiffs-appellants.*

> *Hamilton Stephens Steele + Martin, PLLC, by M. Aaron Lay and Daniel J. Finegan, for defendant-appellee Vista North Carolina Limited Partnership.*

> *Nesxen Pruet, PLLC, by David S. Pokela and Alex R. Williams, for defendant-appellee APC Towers, LLC.*

STROUD, Judge.

Plaintiffs appeal from an order granting summary judgment in favor of Defendants and denying their motion for summary judgment. Because Defendant Vista had the authority to amend the declaration and the amendment is reasonable,

the trial court did not err in granting summary judgment in favor of Defendants and denying Plaintiffs' motion for summary judgment.

## I.    Background

In 2010, Plaintiffs became the owners of a lot in the Riverbend Highlands subdivision in Rutherford County.    Defendant Vista North Carolina Limited Partnership ("Vista") is the developer of Riverbend Highlands Subdivision, a residential subdivision with 573 lots.    Defendant Vista is also the declarant of the covenants and restrictions for the subdivision.    Riverbend Highlands is in a heavily wooded mountainous area, and most of the 573 lots are vacant, including Plaintiffs' lot.

Riverbend Highlands ("Subdivision") is governed by the "Amended and Restated Declaration of Covenants and Restrictions as of July 16th 2007" ("2007 Declaration").[1]    These restrictions state in relevant part:

> Section 4.1. Residential. Each of the Lots in the Community shall be, and the same hereby are, restricted exclusively to single-family residential use and shall be occupied only by a single family, its nurses, aides, servants, or caretakes, and guests.
>
> . . . .
>
> Section 4.3. Business Activities. No business activities shall be conducted on any portion of this Planned Community, not any Lot nor any Residence, provided,

---

[1] Defendant Vista's predecessor in interest established the subdivision with the Original Declaration, filed in 1975.  The Original Declaration was replaced by the Amended and Restated Declaration recorded by Defendant Vista in 2007.

however; private offices may be maintained in residences constructed on Lots so long as such use is incidental the primary residential use of the Lot and is approved by the Board of Directors.

. . . .

Section 5.1 Utility Easements. Developer hereby reserves the right without further consent from any land owner to grant to any public utility company, municipality, the Association or other governmental unit, water or sewer company an easement for a right-of-way in all streets and roads on which the land hereby conveyed abuts and also in and to a 10 foot strip of land located along the front lot line, and a 5 foot strip of land located along any other lot line, for the right to erect and lay, or cause to be erected or laid, maintained, removed or repaired, all light, telephone and telegraph poles, wires, water and gas pipes and conduits catch basins, surface drains, sewage lines, access easement and other customary or usual appurtenances as may, from time to time, in the opinion of the Developer, or any utility company, or governmental authority, be deemed necessary for maintenance and repair of said utilities or other appurtenances. Any right of recourse on account of temporary or other inconvenience caused thereby against Developer is hereby waived by the Buyer.

. . . .

Section 10.4. Amendments. Any of the provisions of this Declaration may be annulled, amended or modified as to all or part of the lots subject to these restrictions at any time by the filing in the Office of the Register of Deeds of Rutherford County of any instrument setting forth, such annulment, amendment or modification, executed by either the Developer, or assigns at any time during which it owns of record a lot in Riverbend Highlands Subdivision or adjacent properties which it has or intends to subdivide or the Owners of record (as shown upon the records in the Officer of the Register of Deeds for Rutherford County at

the time of filing of such instrument) of sixty-seven perfect (67%) of the Lots subject to these restrictions. Should a dispute arise between an amendment made by the owners of record of sixty-seven (67%) of the Lots subject to the restrictions versus an amendment made by the Developer, the Developers amendment shall prevail. The procedure for amendment shall follow the procedure set forth in Section 47F-2-117 of the Planned Community Act. No amendment shall become effective until recorded in the office of the Register of Deeds of Rutherford County, North Carolina.

In 2015, Defendant Vista was approached by Defendant APC Towers, LLC, (collectively "Defendants") about installing a wireless communications tower ("Tower") within Riverbend Highlands. In November 2015, Defendant Vista entered into a lease with Defendant APC Towers to permit the construction and operation of the Tower on a lot owned by Defendant Vista. In March 2016, Defendant Vista recorded an amendment to the 2007 Declaration ("March 2016 Amendment") which deleted Section 5.1 of the 2007 Declaration and replaced it with this provision:

> Section 5.1. <u>Utility and Communications Facility Easements and Leaseholds.</u> Developer hereby reserves the right without further consent from any Owner to grant to any public utility company, municipality, private entity, the Association and any governmental unit, water or sewer company an easement for a right-of way in all streets and roads on which the land hereby conveyed abuts, in and to a 10 foot strip of land located along the front lot line, a 5 foot strip of land located along any other lot line, or an easement or leasehold interest in all or any portion of a lot, for the right to erect and lay, or cause to be erected or laid, maintained, removed or repaired, all light, telephone and telegraph poles, wireless communications tower(s), wires, water and gas pipes and conduits catch basins, surface

> drains, sewage lines, access easement and other customary or usual appurtenances as may, from time to time, in the opinion of the Developer, or the applicable grantee or lessee, as be deemed necessary by such party for maintenance and repair of said utilities or other appurtenances hereinabove delineated. Any right of recourse on account of temporary or to her inconvenience caused thereby against Developer is hereby waived by each Owner. Notwithstanding anything contained in this Declaration, the restrictions contained in Article 4 or otherwise in this Declaration shall not apply to any Lot whereon Declarant grants an easement or leasehold interest pursuant to this Section 5.1, with respect to the grantee's or lessee's use of and construction at such Lot.

In April 2016, Defendant Vista sent a letter to Plaintiffs and offered to exchange their lot for one in another nearby development, either Riverbend Highlands or Riverbend at Lake Lure. Other affected owners successfully exchanged lots with Defendant Vista, but Plaintiffs declined to do so. Work began on the Tower on 11 May 2016. Plaintiffs' counsel sent Defendant Vista a letter dated 11 May 2016 informing Defendant Vista that the covenants restrict use of the lots to "single family residential use." The letter states, "Should you attempt to violate these covenants by erecting a cell tower on a platted lot, my client will have no choice but to seek injunctive relief prohibiting the construction and seek reimbursement of their reasonable attorney's fees pursuant to the Planned Community Act." Plaintiffs sent a letter to Defendant APC Towers on 24 May 2016 informing it of their intent to sue.

Plaintiffs filed a complaint asking the trial court for a declaratory judgment and injunctive relief on 1 June 2016.[2]

The Tower was completed in July 2016. The dimensions of the Tower are approximately thirty-three feet six inches in diameter at the base. The tower pole is ten feet in diameter and has a height of 195 feet. It is on a lot adjacent to Plaintiffs' lot. The president of Vista North Carolina, Inc., the general partner in Defendant Vista, stated in his affidavit that "[t]he tower was constructed for AT&T to provide high-speed mobile broadband internet, phone, and related telecommunications services."

On 11 August 2016, Defendant Vista filed a motion to dismiss, answer, and affirmative defenses. On 12 August 2016, Defendants filed a joint motion for judgment on the pleadings. Their motion noted the various provisions of the 2007 Declaration and the March 2016 Amendment quoted herein and that Defendant Vista was the developer of the subdivision and still owned a majority of the 573 lots in the subdivision. Thus, Defendant Vista contended that as the "developer" it had essentially unlimited authority to amend the 2007 Declaration because the subdivision was still within the developer control period. Defendants alleged that wireless telecommunications are a public utility, and Section 5.1 of the 2007

---

[2] Plaintiffs' complaint also named approximately 150 nominal defendants, including all record owners of all lots in Riverbend Highlands. One of the nominal defendants appeared in this action before the trial court but none appealed or appeared before this Court.

Declaration provided for provision of public utility services. Defendant Vista alleged the March 2016 Amendment was filed to clarify "that Section 5.1 contemplated the installation of telecommunication utility facilities, including technologies such as wireless communications, which did not exist at the time that the first declaration was written for Riverbend Highlands." Defendants further alleged that the construction of the Tower did not change the residential nature of the community, is not an operating business, and does not generate noise or traffic: "It is simply an unmanned utility tower that transmits wireless signals and data for cellular telephones and other mobile devices." Defendants alleged federal law embodies and promotes the public policy of providing wireless telecommunication services.[3] Defendants argued that Plaintiffs' claims were based only upon the aesthetics of the Tower.[4]

All parties moved for judgment on the pleadings. After a hearing, the trial court entered an order on 18 October 2016 granting in part judgment on the pleadings in favor of Plaintiffs and declaring the March 2016 Amendment to be unreasonable

---

[3] Although North Carolina General Statute § 160A-400.50 applies only to municipalities, Defendant APC Towers notes the public policy to provide wireless telecommunications service throughout the State to ensure "reliable wireless service to the public, government agencies, and first responders, with the intention of furthering the public safety and general welfare." *See* N.C. Gen. Stat. § 160A-400.50(a) (2017).

[4] Defendants summarized Plaintiffs' lawsuit as a "NIMBY" claim. "NIMBY" is an acronym for "not in my backyard," and it is defined as "opposition to the locating of something considered undesirable (such as a prison or incinerator) in one's neighborhood." *Merriam-Webster*, *https://www.merriam-webster.com/dictionary/NIMBY* (last visited Apr. 6, 2020).

as a matter of law because under the language of the March 2016 Amendment, the developer had "carte blanc [sic] ability to remove the very essence and nature of the Subdivision from any lot, and to substantially interfere with the Landowner's actual residential use of a lot." The trial court noted that under the March 2016 Amendment, a "Developer could grant a utility lease over landowner's house." But the trial court denied judgment on the pleadings as to whether the "construction of a wireless communication tower on a lot is in violation of the valid Declarations" under *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 633 S.E.2d 78 (2006). The trial court stated it did "not have sufficient information from the pleadings to address the nature and character of the community as well as the nature and character of the construction generating the complaint." The court denied the remaining relief sought by both parties.

The parties then conducted discovery. In November 2016, Defendant Vista recorded a second amendment to the 2007 Declaration ("November 2016 Amendment") which nullified and struck the March 2016 Amendment which the trial court had determined was unreasonable as a matter of law in its October 2016 order. The November 2016 Amendment replaced Section 5.1 of the 2007 Declaration with the following:

> Section 5.1. <u>Utility and Communications Facility Easements and Leaseholds.</u> Developer hereby reserves the right without further consent from any Owner to grant to any public utility company, municipality, private entity,

the Association and any governmental unit, water or sewer company an easement for a right-of-way in all streets and roads on which the land hereby conveyed abuts, in and to a 10 foot strip of land located along the front lot line, a 5 foot strip of land located along any other lot line for the right to erect and lay, or cause to be erected or laid, maintained, removed or repaired, all light, telephone and sewage lines, access easement and other customary or usual appurtenances as may, from time to time, in the opinion of the Developer, or the applicable grantee or lessee, as be deemed necessary by such party for maintenance and repair of said utilities or other appurtenances hereinabove delineated. The Developer may grant an easement or leasehold interest in all or any portion of one Developer owned Lot for the placement and construction of one wireless communications tower in order to improve wireless communications services to Riverbend Highlands. Any right of recourse on account of temporary or other inconvenience caused thereby against Developer is hereby waived by each Owner. Notwithstanding anything contained in this Declaration, the residential construction of a single monopole wireless communications tower on said Lot and the operation thereof and the construction and operation of such shall not be considered a nuisance under this Declaration or otherwise a violation of this Declaration.

On 5 October 2017, Plaintiffs filed a motion for summary judgment. With the motion, Plaintiffs submitted the Rule 30(b)(6) depositions of Defendants and the affidavits of Fred Epeley[5] and Plaintiff Angela Poovey. On 8 January 2018, Defendant APC filed a motion for summary judgment, noting its intent to rely upon the pleadings, affidavits, depositions, and other documents produced in discovery,

---

[5] Fred Epeley appears to be a nominal defendant, and his affidavit included photographs of the completed cell tower.

and attached the affidavit of David Pierce, the Senior Vice President of Operations for APC Towers. On 2 February 2018, Defendant Vista also filed a motion for summary judgment.

After a hearing on the summary judgment motions, the trial court denied Plaintiffs' motion for summary judgment and granted Defendants' motion for summary judgment. After a cross-claim by a nominal defendant was dismissed, Plaintiffs timely appealed.

## II. Standard of Review

The standard of review for a summary judgment motion is well established:

> Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial. Nevertheless, "[i]f there is any question as to the weight of evidence summary judgment should be denied."

*In re Will of Jones*, 362 N.C. 569, 573-74, 669 S.E.2d 572, 576 (2008) (alteration in original) (citations omitted).

None of the parties contend there is any genuine issue of material fact and all argued before the trial court, and on appeal, that summary judgment was appropriate

as a matter of law. The parties submitted affidavits, depositions, and discovery materials to support their motions, providing detailed information regarding the subdivision, the Declarations and amendments, the dimensions and characteristics of the Tower, the location of the Tower, and views of the Tower from various points in the subdivision. But the material facts regarding the nature and character of the subdivision and the Tower are not disputed. Plaintiffs' evidence regarding the facts addresses primarily their opinion that the Tower obstructs the view from their lot and would interfere with their plans to construct a home on the lot. For purposes of review of the ruling on summary judgment, we take Plaintiffs' evidence as true and assume that the Tower does obstruct the view from their lot. Defendants' evidence regarding the facts does not conflict with Plaintiffs' evidence; it addresses different facts, such as the character of the subdivision, topography, and information regarding the location and need for the Tower. Plaintiffs' legal arguments address primarily their contention that the Tower is a commercial or business activity and that the November 2016 Amendment is unreasonable because it is inconsistent with the character of the subdivision as a residential community.

III.    Reasonableness of Amended Restrictive Covenants

Plaintiffs argue "[t]he cell tower location is not consistent with residential lot use nor the utility easement size limitations required by the 2007 Declarations." But Defendant Vista amended the 2007 Declaration, and Plaintiffs do not challenge the

procedure by which the amendment was adopted, so the relevant question is whether the Tower's location is consistent with the November 2016 Amendment to the Declaration. Placement of the Tower was authorized by the November 2016 Amendment. In the 2007 Declaration, Defendant Vista reserved the authority to amend "[a]ny of the provisions" of the Declaration "at any time" it still owned a subdivision lot, and there is no dispute that Defendant Vista owned many lots. To rebut the presumption of validity of the November 2016 Amendment, Plaintiffs contend the November 2016 Amendment is unreasonable based on *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 633 S.E.2d 78.

In *Armstrong*, our Supreme Court considered "to what extent the homeowners' association may amend a declaration of restrictive covenants." *Id.* at 548, 633 S.E.2d at 81 (emphasis omitted). The Supreme Court held that "a provision authorizing a homeowners' association to amend a declaration of covenants does not permit amendments of unlimited scope; rather, every amendment must be *reasonable* in light of the contracting parties' original intent." *Id.* at 559, 633 S.E.2d at 87 (footnote omitted). A court should consider various factors to determine if an amendment is reasonable, including "the language of the declaration, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community." *Id.* at 548, 633 S.E.2d at 81.

In *Armstrong*, the neighborhood consisted of "forty-nine private lots set out along two main roads and four *cul de sacs*." *Id.* at 560, 633 S.E.2d at 88. There were no common areas or amenities. *Id.* The Supreme Court noted that "[g]iven the nature of this community, it makes sense that the Declaration itself did not contain any affirmative covenants authorizing assessments. Neither the Declaration nor the plat shows any source of common expense." *Id.* The only shared obligation in the covenants was payment of the utility bill for a lighted sign at the entrance. *Id.* ("Each lot owner's pro rata share of this expense totals approximately seven dollars and twenty cents per year.").

Over the years, the Association began charging lot owners for additional assessments up to about $80 to $100 per year to cover the costs of "mowing the roadside on individual private lots . . . for snow removal from subdivision roads, and for operating and legal expenses." *Id.* at 551, 633 S.E.2d at 82-83. After the petitioners raised an objection to the increasing demands for payment of various assessments by the lot owners, the Association adopted amendments to the bylaws. *Id.* at 552, 633 S.E.2d at 883. The amended bylaws were "substantially different" from the "originally recorded Declaration" and included several entirely new obligations imposed upon lot owners,

> including a clause requiring Association membership, a clause restricting rentals to terms of six months or greater, and clauses conferring powers and duties on the Association which correspond to the powers

and duties previously adopted in the Association's amended by-laws.

Additionally, the Amended Declaration imposes new affirmative obligations on lot owners. It contains provisions authorizing the assessment of fees and the entry of a lien against any property whose owner has failed to pay assessed fees for a period of ninety days. According to the Amended Declaration, such fees are to be "assessed for common expenses" and "shall be used for the general purposes of promoting the safety, welfare, recreation, health, common benefit, and enjoyment of the residents of Lots in The Ledges as may be more specifically authorized from time to time by the Board." Special assessments may be made if the annual fee is inadequate in any year; however, surplus funds are to be retained by the Association. Unpaid assessments bear twelve percent interest per annum.

*Id.* at 552-53, 633 S.E.2d 78, 83-84.

The Supreme Court held the amendment was unreasonable because it gave the Association "practically unlimited power" to assess lots and was "contrary to the original intent of the contracting parties." *Id.* at 561, 633 S.E.2d at 88. The Supreme Court also considered the nature and character of the community, since the original declarations did not provide for any common areas or amenities which might require increasing assessments. *Id.*

In *Southeastern Jurisdictional Administrative Council, Inc. v. Emerson,* our Supreme Court addressed a community with a very different nature and character than in *Armstrong* and held an amendment which imposed an annual "*SERVICE CHARGE* in an amount fixed by the SEJ Administrative Council for police protection,

street maintenance, street lighting, drainage maintenance, administrative costs and upkeep of the common areas" to be reasonable after considering the factors noted in *Armstrong*. 363 N.C. 590, 599-600, 683 S.E.2d 366, 372 (2009) [hereinafter *SJAC*]. In highlighting the differences between the two cases, the Court noted the importance of "the nature and character of the community" and "the legitimate expectations of [the] lot owners:"

> In considering "the legitimate expectations of [the] lot owners" in *Armstrong*, this Court emphasized that, at the time the plaintiff property owners purchased their lots, the community contained "no common areas or amenities," and that "[n]either the Declaration nor the plat shows any source of common expense." The plaintiffs in *Armstrong* professed a specific desire to live in a community lacking amenities for which they did not wish to pay, and they believed at the time of purchase that The Ledges was such a community. This Court agreed that the plaintiffs "purchased their lots without notice that they would be subjected to additional restrictions on use of the lots and responsible for additional affirmative monetary obligations imposed by a homeowners' association" and therefore, concluded that it would be unreasonable to enforce the amended covenants against them and require them to pay the disputed fees.
>
> The Assembly stands in stark contrast to the community at issue in *Armstrong*. Whereas The Ledges community had only existed for about fifteen years when that controversy arose and was a fairly typical subdivision, the Assembly has existed for nearly a century and has spent that entire time purposefully developing its unique, religious community character. To that end, the Council and its predecessors have subjected the Assembly's residential lots to a wide variety of detailed restrictions, and they have done so consistently since the first lots were sold. Since the Assembly's establishment, all deeds

> conveying land within the community have included covenants requiring compliance with the bylaws, rules, and regulations periodically adopted by the Council.

*Id.* at 597-98, 683 S.E.2d at 370-71 (2009) (alterations in original) (citations omitted).

Defendant Vista argues that *Armstrong* does not apply to this case because "there is no mandate from the Supreme Court that applies the 'reasonableness' standard to amendments made by a developer within the developer's control period of a subdivision." But our Supreme Court has made no distinction in its analysis of the reasonableness of amendments based upon whether the amendment was made by a developer or a homeowners association. *See generally Armstrong*, 360 N.C. 547, 633 S.E.2d 78. For example, *SJAC* involved a unique situation, as the new assessments were imposed by neither a traditional homeowners association nor a traditional developer but by the

> Southeastern Jurisdictional Administrative Council, Inc. ("the Council") is a nonprofit, non-stock corporation that manages, owns, develops, and sells land in Haywood County known as the Lake Junaluska Assembly Development. In addition, the Council maintains and operates the Assembly by providing such services as street lighting, fire and police protection, and maintenance of roads and common areas. The Council is the successor in interest to the Lake Junaluska Assembly; the Lake Junaluska Methodist Assembly; and ultimately the Southern Assembly of the Methodist Church, which was the Assembly's earliest incarnation. The Council operates the Assembly under the auspices of the Southeastern Jurisdictional Conference of the United Methodist Church in the United States of America.

363 N.C. at 591, 683 S.E.2d at 367. Thus, the requirement of reasonableness applies to an amendment adopted by a developer as well as by a homeowners association. *See id.*

In addition, Defendant Vista argues that a later statutory amendment provides that an amendment properly adopted is presumed reasonable. In 2013, the Planned Community Act was amended to add this provision: "Any amendment passed pursuant to the provisions of this section or the procedures provided for in the declaration are presumed valid and enforceable." N.C. Gen. Stat. § 47F-2-117(d) (2017). Defendant Vista argues that since the "[November 2016 Amendment] was adopted and recorded in compliance with the procedures set forth in Section 10.4 of the Declaration, it is accordingly entitled to this presumption of validity and enforceability."

Plaintiffs respond that North Carolina General Statute § 47F-2-117(d) addresses only the procedure for amending declarations and not "substantive challenges to amendments." We agree that North Carolina General Statute § 47F-2-117(d) does not eliminate the reasonableness requirement as set out in *Armstrong*. In *Kimler v. Crossings at Sugar Hill Property Owner's Ass'n*, this Court addressed the application of North Carolina General Statute § 47F-2-117 to the authority of a homeowner's association to amend a declaration but then also considered the

reasonableness of the amendment. 248 N.C. App. 518, 789 S.E.2d 507 (2016). After holding the amendment in question to be valid and enforceable, this Court noted:

> Sugar Hill HOA's authority to amend the Declaration is not unlimited. Rather, our Supreme Court has held that an owners' association's authority to amend a declaration is limited to those amendments which are "reasonable [.]" "Reasonableness may be ascertained from the language of the declaration, deeds, and plats, together with the other objective circumstances surrounding the parties' bargain, including the nature and character of the community."

*Id.* at 524, 789 S.E.2d at 511 (citation omitted) (quoting *Armstrong*, 360 N.C. at 548, 633 S.E.2d at 81).

Plaintiffs argue, based on *Armstrong*, the construction of the Tower was not reasonable "in light of the contract parties' original intent" based on the 2007 Declaration. Plaintiffs further argue "the intent of a residential use only community is evident in the interdependence of the restriction on non-residential use and the requirement of narrow utility easements. Examining the nature of the community prior to the [November] 2016 Amendment supports a finding of an unreasonable amendment." Plaintiffs note the 2007 Declaration provides for fifteen or ten-feet wide utility easements along the lot lines, and the only utility structures in the subdivision before construction of the Tower were "small utility poles approximately twelve to fifteen inches in diameter and approximately twenty-five to thirty feet tall." These poles were "sparsely distributed within the subdivision[] . . . to provide telephone and

electrical service to houses . . . and do not substantially interfere with a lot owners use of their lot or view from their lot." Plaintiffs characterize the Tower as a business or commercial use of the lot and argue that the character of the neighborhood is residential, as the Declarations prohibit "business activities" in the community.

It is true that most utility companies are businesses, and they conduct commercial activities; they sell products and services for a profit. But their business *is* the provision of utility services, including utilities serving residential customers. The unmanned tower is not a production facility or store location; it is more comparable to a power line or sewer pipe. Plaintiffs are correct that the subdivision is limited to residential use; Defendants agree but argue that the Tower "is a utility installation for the benefit of the Riverbend Highland development, not a commercial endeavor."

The 2007 Declaration provided for utility easements for

> light, telephone and telegraph poles, wires, water and gas pipes and conduits, catch basins, surface drains, sewage lines, access easement and other customary or usual appurtenances as may, from time to time, in the opinion of the Developer, or any utility company, or governmental entity, be deemed necessary for maintenance and repair of said utilities or other appurtenances.

Plaintiffs focus on the limitation of fifteen and ten-feet wide strips of land reserved for utilities in the 2007 Declaration, as opposed to a larger area as required for a cellular tower. But the only substantive change the November 2016 Amendment

made to the 2007 Declaration as to utility easements was to allow *one* of the 573 lots in the community to be devoted to a cellular tower. The November 2016 Amendment eliminated the problem noted by the trial court in the March 2016 Amendment, which would have given Defendant Vista "carte blanc [sic] ability to remove the very essence and nature of the Subdivision from any lot" since that amendment did not limit the number of lots which could be used for this purpose. The November 2016 Amendment allows a cellular tower on only one lot of the 573 lots.

Narrow strips of land sufficed for nearly all utilities in residential subdivisions in the past—such as the telephone and telegraph poles referred to in the 2007 Declaration—but larger installations are sometimes needed for portions of utilities.[6] Based upon the 2007 Declarations, the original plan for the community provided for availability of modern utilities for the residences, including electricity, gas, telecommunications, water, sewer, and "other customary or usual appurtenances as may, from time to time, . . . be deemed necessary for maintenance and repair" of these services. Cellular phone service is a telecommunications service, and even if it was less common in 2007, it is now well-established that cellular phone service is a "public utility," and cellular phone service provides the same service to the residences in the community as the telephone and telegraph service by wires has traditionally

---

[6] Some of the electrical structures within the subdivision are larger than the roadside poles noted by Plaintiffs, but the evidence does not address whether those structures are located fully within the narrow roadside easements. For purposes of summary judgment review, we will assume they are.

provided.[7] *See Bellsouth Carolinas PCS, L.P. v. Henderson Cty. Zoning Bd. Of Adjustment*, 174 N.C. App. 574, 579, 621 S.E.2d 270, 274 (2005) ("[W]e hold that a cellular telephone company is a 'public utility.' In addition, a cellular telephone tower which provides cellular telephone service is a 'public utility station' under Section 603.01 of the Henderson County Zoning Ordinance. The Board erred as a matter of law in holding BellSouth was not a public utility and by concluding that the cellular tower was not a 'public utility station.'").

Defendant Vista presented uncontroverted evidence that a cellular tower was needed in the subdivision to "alleviate the lack of access to highspeed mobile communications services to [the subdivision] and surrounding areas under a federal initiative to bring higher speed and accessible communications to more rural areas." Defendant Vista considered wireless broadband telephone and internet services to be "a necessary utility for today's real estate market and the demand of its lot owners and potential buyers." In addition, if Defendant Vista had not agreed for the Tower to be placed within the subdivision, a similar tower would have been placed on adjoining land but Defendant Vista would have had no control over "the type of tower, location, visibility, or other aesthetic factors, including obstruction of views from lots in Riverbend Highlands." To select the lot for the Tower, Defendant Vista "worked with APC Towers to locate the Tower on a lot that provided a balance of coverage and

---

[7] The means of providing a particular utility may change over time, as revealed by the Declarations reference to "telegraph poles."

limited any perceived line of sight impacts for owners and would not require the granting of an access easement or other easement over lots not owned by [Vista]."

The subdivision is in a mountainous area and had areas with poor cell phone reception. The 2007 Declarations provided for utility services, including telecommunications, for the residents of the subdivision. Defendants determined there was need for an additional cellular tower in this vicinity. There were other potential locations for a tower, including on land adjoining the subdivision, although the tower would still have been visible from some lots in the subdivision. Indeed, a tower outside the subdivision could have still physically adjoined a lot or lots within the subdivision. Defendants considered both the technical needs for the location of the Tower as well as the need to avoid blocking views of subdivision residents and determined that a lot within the subdivision would best address both concerns. In the terminology of both the November 2016 Declaration and the 2007 Declaration, a cellular tower is a "customary or usual appurtenance" which Defendant Vista "deemed necessary for maintenance" of telephone services in the community. Plaintiffs' affidavits and evidence do not refute any of this evidence regarding the need for a cellular tower to provide reliable phone service in the area or the technical requirements for its location. Instead, Plaintiffs object because the Tower is on the lot adjoining theirs and it interferes with their "previously unobstructed view." Certainly, the view is an important consideration, particularly in a community in a

mountainous area. But even if we take the allegations of Plaintiffs' affidavits as true, the 2007 Declaration does not promise all lots an "unobstructed view;" but it does provide for utility service, including telephone service, to all residents and it provides for changes as needed "from time to time" to maintain and repair the utility services.

After considering the "the language of the declaration, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, including the nature and character of the community," *Armstrong*, 360 N.C. at 548, 633 S.E.2d at 81, the November 2016 Amendment was reasonable. Thus, the trial court correctly granted Defendants' motions for summary judgment, denied Plaintiffs' motion for summary judgment, and dismissed Plaintiffs' claims.

## IV.    Conclusion

Defendant Vista had the authority to amend the declaration. Because the November 2016 Amendment was reasonable, the trial court did not err in granting summary judgment in favor of Defendants and denying Plaintiffs' motion for summary judgment.

AFFIRMED.

Judges DILLON and YOUNG concur.